UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   NELSON GONZALES,                                           No. 21-11384-j13

Debtor.

## MEMORANDUM OPINION

The Court held a final, evidentiary hearing on the Motion for Determination that Automatic Stay Does Not Apply or Alternatively for Relief from the Stay and for Determination that Contract was Terminated Pre-Petition and Cannot be Assumed ("Motion" – Doc. 42) filed by Grover C. Herring and Frances L. Herring, sellers under a real estate contract with Debtor, Nelson Gonzales, and Anthony Menchaca, as buyers (the "REC").[1] The Herrings contend that they terminated the REC before Debtor filed his chapter 13 bankruptcy case. Debtor counters that his confirmed chapter 13 plan, which treats the REC as a secured claim, binds the Herrings to its terms. The evidence admitted at the final hearing is inconclusive. On the one hand, the Herrings presented insufficient evidence of proper pre-petition termination of the REC. On the other hand, the evidence also failed to establish conclusively that the Herrings received proper notice of Debtor's bankruptcy case and the deadline to object to Debtor's chapter 13 plan.

Having considered the evidence and the applicable caselaw, and the applicable burdens of proof, the Court concludes that 1) the Herrings failed to establish that the REC was properly terminated pre-petition; 2) the Herrings are not bound by the terms of Debtor's confirmed chapter 13 plan; and 3) under the circumstances, the Court will not grant the Herrings' request for relief from the automatic stay if Debtor timely provides the Herrings with proof of insurance on the property. The Court will deny the Motion, conditioned upon proof of insurance, and grant

---

[1] Exhibit M.

Debtor an opportunity to amend his chapter 13 Plan to provide for treatment of the Herrings' claim, which might include alternative treatment of the REC as a secured claim consistent with 11 U.S.C. § 1322 or as an executory contract to be assumed under 11 U.S.C. § 365.

FACTS AND PROCEDURAL HISTORY

Debtor and Mr. Menchaca are Frances Herring's cousins. On or about December 23, 2020, the Herrings, as sellers, and Debtor and Mr. Menchaca, as buyers, entered into the REC for the sale of property located at 651 Old Sequoia Rd, Chaparral, New Mexico (the "Property").[2] The purchase price for the Property under the REC was $114,000, payable in 144 equal monthly installments of $1,026.02 with the unpaid principal balance bearing interest at the rate of 4.5% per annum.[3] The REC was not recorded. Instead, a Notice of Escrow signed by the Herrings, Debtor, and Mr. Menchaca referencing the REC and including the legal description of the Property was recorded in the real property records of Dona Ana County, New Mexico on January 4, 2021.[4] Mountain States Escrow, Inc. ("MSE") is the escrow agent appointed under the REC.[5]

The REC provides for a 30-day cure period following notice of default. The REC provides further that if the default is not timely cured, the Herrings at their option may either accelerate the due dates of all payments under the REC or terminate the buyers' rights in the Property and retain all sums paid as liquidated damages for the use of the Property through that date.[6] Upon termination of the buyers' rights in the Property, "all rights of Buyer in the Property will end."[7]

The default notice provision in the REC is as follows:

---

[2] Exhibit M.
[3] REC, ¶ 2(A) – Exhibit M.
[4] Exhibit V.
[5] REC, ¶ 10(B) – Exhibit M.
[6] REC, ¶ 8(C) - Exhibit M.
[7] REC, ¶ 8(C)(1)(b) – Exhibit M.

> Time is of the essence in this Contract. If Buyer fails to pay or perform any obligation of Buyer under this Contract, the failure will constitute a default and Seller may give notice of default to Buyer, specifying the default and the curative action required (the "Default Notice"), at Buyer's mailing address . . . . [8]

The REC provides further:

> Default Notice will be given in writing by certified mail, return receipt requested, and regular first-class mail, addressed to Buyer at the address for Buyer provided in Paragraph 8A, with a copy to Escrow Agent. Default Notice given as provided in paragraph 8A is sufficient for all purposes, whether or not the Default Notice is actually received.[9]

Under the REC,

> If the final day for curing the default falls on a non-business day of Escrow Agent, then the period for curing the default will extend to the close of business on the next business day of Escrow Agent.[10]

If the buyers fail to cure a default, the REC provides that the sellers may elect to "terminate Buyer's rights in the Property and retain all sums paid as liquidated damages to that date for the use of the Property . . . ."[11] A provision in the REC titled "Affidavit of Uncured Default and Election of Termination" provides:

> A recordable affidavit (the "Default Affidavit") made by Seller, Seller's Agent, or Escrow Agent, identifying the parties, stating the legal description of the Property or the recording date of this Contract, stating the date the Default Notice was given, stating that the specified default has not been cured within the time allowed and that Seller has elected to terminate Buyer's right in the Property, and delivered to Escrow Agent, will be conclusive proof of the uncured default and election of termination of Buyer's rights in the Property.[12]

Debtor and Mr. Menchaca failed to make the April 2021 payment under the REC. On June 9, 2021, the Herrings' attorney, Matthew Watson, sent a Notice of Default to Debtor and

---

[8] REC, ¶ 8(A) – Exhibit M.
[9] REC, ¶ 8(B) – Exhibit M.
[10] REC, ¶ 8(C)(2) – Exhibit M.
[11] REC, ¶ 8(C)(1)(b) – Exhibit M.
[12] REC, ¶ 8(D) – Exhibit M.

Mr. Menchaca (the "First Notice of Default").[13] The First Notice of Default indicates that it was sent by certified mail.[14] The First Notice of Default stated, among other things, that Debtor and Mr. Menchaca failed to make two monthly installment payments, notified them that they had 30 days within which to cure the default, and that if the default was not cured within 30 days, the Herrings would terminate their interest in the Property.[15]

On July 7, 2021, Mr. Watson sent a letter to Kelly O'Connell[16] by email stating that the payment of $2,671.00 from Debtor and Mr. Menchaca was short by $238.79 and that Debtor and Mr. Menchaca have failed to provide proof of insurance.[17] On July 14, 2021, Mr. Watson sent a follow up letter via email to Ms. O'Connell stating that the letter is "a revised Notice of Default."[18] The letter indicates that the Debtor and Mr. Menchaca are in default for the July, 2021 payment of $1012.02, plus taxes and insurance, plus late charges, and escrow fee, together totaling $1634.69, and that proof of insurance has not been provided.[19] The July 14, 2021 letter indicates that if the defaults are not cured within 30 days, the REC will be terminated and the Property forfeited.[20]

On October 8, 2021, Mr. Watson sent a "Final Notice of Default" via certified mail to Debtor and Mr. Menchaca, with a copy by email and hand-delivery to Mountain States Escrow, and by email to Ms. O'Connell.[21] There is no evidence that the notice was sent to Debtor and Mr. Menchaca by certified mail, return receipt requested or by regular U.S. mail or that it actually

---

[13] Exhibit O.
[14] *Id.*
[15] *Id.*
[16] It is not entirely clear who Kelly O'Connell is. From the context of the correspondence, it appears that Kelly O'Connell served as counsel for Debtor and Mr. Menchaca in connection with the REC.
[17] Exhibit P.
[18] Exhibit Q.
[19] *Id.*
[20] *Id.*
[21] Exhibit R.

was received by them. The Final Notice of Default identifies late payments for August, September, and October, 2021, plus taxes and insurance, a collection fee, late charges, and escrow fee, totaling $4,217.41 and also states that proof of hazard insurance has not been provided.[22] The Final Notice of Default makes a demand to cure the default within 30 days of the date of the letter by paying the past due balance and providing proof of insurance.[23] It also provides that failure to cure the default "will result in termination of this agreement and a forfeiture of the property."[24]

On Sunday, November 8, 2022, the Herrings signed an Affidavit of Uncured Default.[25] The Affidavit of Uncured Default states that 1) the Herrings are sellers under the REC with Debtor and Anthony Menchaca as buyers, 2) a default notice was sent to Debtor and Anthony Menchaca on October 8, 2021, 3) the buyers did not cure the default within 30 days after the notice of default, and 4) the Herrings elect to terminate the REC.[26] The Affidavit of Uncured Default is notarized.[27] The Affidavit of Uncured Default does not include the legal description or address for the Property and does not include any recording information relating to the REC.[28]

On November 9, 2022, the Herrings' attorney, Matthew Watson, sent a letter by U.S. Mail and by email to MSE enclosing the Affidavit of Uncured Default signed by the Herrings together with a copy of the Final Notice of Default. The letter states that the buyers have defaulted and failed to cure the default, and that the sellers elect to terminate the REC. The letter

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Exhibit S.
[26] *Id.*
[27] *Id.*
[28] *Id.*

-5-

Case 21-11384-j13   Doc 71   Filed 12/07/22   Entered 12/07/22 13:35:03 Page 5 of 19

requests return of the Special Warranty Deed signed by the buyers and held by MSE to Mr. Watson.[29]

Mr. Herring received the Special Warranty Deed but did not get instructions on what to do with it. The Special Warranty Deed transferring Debtor's and Mr. Menchaca's interest in the Property to the Herrings was not recorded.

The Herrings sold their property located at 1640 N. Vinton, Anthony, NM 88021-2947 and moved to Falls City, Texas in the fall of 2021. Before they left, sometime before Christmas, Mrs. Herring provided Debtor and Mr. Menchaca with the Herrings' new address in Texas. The Herrings also arranged to have their mail forwarded from their former 1640 N. Vinton, Anthony, NM 88021-2947 address to their Falls City, Texas address.

Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code on December 23, 2021.[30] Notice of the bankruptcy filing, the meeting of creditors, and the preliminary confirmation hearing was sent to the Herrings at 1640 N. Vinton, Anthony, NM 88021-2947 (the address for the Herrings identified in the REC) and to Grover and Fran Herring, c/o Watson Smith, LLC, 1100 S. Main St. #21, Las Cruces, NM 88005-2917.[31] The notice of bankruptcy was not sent to the Herrings at the Falls City, Texas address. Debtor scheduled the Property on Schedule A and scheduled the Herrings' claim as a secured claim on Schedule D.[32] Schedule D identifies the Property but does not identify the REC or otherwise disclose that the document evidencing the Herrings' interest in the Property is based on a real estate contract.[33]

---

[29] *Id.*
[30] Exhibit B.
[31] *See* Doc. 9. The Court takes judicial notice of the documents filed of record in Debtor's bankruptcy case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may sua sponte take judicial notice of its own records and files).
[32] Exhibit A.
[33] *Id.*

Debtor filed a chapter 13 plan (the "Plan") on January 13, 2022.[34] Notice of the deadline to object to the Plan was sent to the Herrings only to their former Anthony, NM address and in care of Watson Smith, LLC.[35]

The Plan provides for treatment of the Herrings' claim in Part 4, titled "Treatment of Secured Claims" as follows: monthly payments of $1,186 beginning January 1, 2021 and ending January 1, 2029, and payment of pre-petition arrearages in the amount of $6,270.[36] Part 7 of the Plan, titled "Executory Contracts and Unexpired Leases" provides for the assumption of two rental lease agreements, but does not list the REC. Part 7 of the Plan provides further that all other executory contracts "are rejected."[37]

The Plan was confirmed on March 10, 2022.[38] Notice of the confirmed Plan was sent to the Herrings at their former Anthony, NM address and c/o Watson Smith, LLC on the same date.[39]

The Herrings do not recall exactly when they learned of Debtor's bankruptcy filing. Mr. Herring initially testified that he learned of the Debtor's bankruptcy filing from Mr. Watson sometime in January of 2022. Mr. Herring later testified that he was sure he did not receive notice of Debtor's Plan until after it was confirmed. Mr. Herring credibly testified that the Herrings did not receive any notices from the bankruptcy court in connection with Debtor's bankruptcy case as a result of their request to forward the mail from their house in Anthony, New Mexico to their home in Texas. At some point, Mr. Watson informed Mr. Herring that the Herrings should retain bankruptcy counsel to represent them in Debtor's bankruptcy case. Mr.

---

[34] Exhibit C.
[35] Exhibit D.
[36] Exhibit C.
[37] *Id.*
[38] Exhibit E.
[39] Exhibit F.

Watson did not represent the Herrings in connection with the bankruptcy case. Mr. Herring testified that once he learned of Debtor's bankruptcy case, he did not delay and asked for legal assistance immediately.

Mr. Watson who represented the Herrings in connection with the REC did not testify at the final hearing. The Herrings filed the Motion on May 31, 2022 through their bankruptcy counsel, Christopher M. Gatton.

The evidence does not establish that (1) the Herring had actual notice of the bankruptcy case prior to confirmation of the Plan (no bankruptcy notices were sent directly to the Herrings at their Falls City, Texas address); or (2) the Herrings received any bankruptcy notices from the bankruptcy court at their Falls City address as a result of their having forwarded mail to that address.

## DISCUSSION

A. Whether the Real Estate Contract was terminated pre-petition

Typically, in New Mexico if real property is sold under a real estate contract the real estate contract is recorded in the real estate records of the county in which the property is situated. The seller retains legal title and the buyer has equitable title to the property. An independent escrow agent holds a warranty deed from the seller to the buyer and a special warranty deed from the buyer to the seller. If the buyer completes its obligations under the real estate contract, the warranty deed from the seller to the buyer is recorded thereby vesting legal title to the property in the buyer. If the buyer defaults under the real estate contract and the seller validly elects to terminate the buyer's interest in the property, the special warranty deed from the buyer to the seller is recorded to extinguish the buyer's equitable title to the property, and the

buyer regains possession of the property and retains the payments made under the real estate contract as rent.[40]

New Mexico law recognizes this type of real estate contract under which the seller retains bare legal title and the buyer holds equitable title to the property until completion of all payments under the real estate contract. *See In re Anthony*, 1992-NMSC-038, ¶ 11, 114 N.M. 95, 98, 835 P.2d 811, 814 ("A vendor under an executory contract for the sale of realty holds bare legal title to the real estate until full payment of the purchase price."); *Bank of Santa Fe v. Garcia*, 1985-NMCA-026, ¶ 7, 102 N.M. 588, 590, 698 P.2d 458, 460 ("Under a real estate contract, the purchaser holds equitable title, while the seller retains legal title in trust until the contract is paid."); *In re Martinez*, 469 B.R. 74, 81 n. 2 (Bankr. D.N.M. 2012) ("In New Mexico, the buyer under a real estate contract is vested with equitable title in and has equitable ownership of the real estate." (citing *Garcia v. Garcia*, 1991-NMSC-023, ¶ 28, 111 N.M. 581, 588, 808 P.2d 31, 38 (1991))).

Upon default by the buyer, a real estate contract allows the seller to elect either to 1) accelerate the debt or 2) terminate the contract, retain the payments made up to the default as liquidated damages for the buyer's use of the property, and retake possession of the property. *Huckins v. Ritter*, 1983-NMSC-033, ¶ 4, 99 N.M. 560, 561, 661 P.2d 52, 53 (upon purchaser's default under a real estate contract, the seller is entitled to terminate the contract, regain possession of the property, and retain the payments under the real estate contract as rental payments for use of the property); *Hale v. Whitlock*, 1979-NMSC-028, ¶ 5, 92 N.M. 657, 657-58, 593 P.2d 754, 754-55 ("It is well settled in New Mexico that the type of real estate contract

---

[40] The Court is relying on its knowledge and experience in characterizing how a typical real estate contract works in New Mexico.

involved in this case is enforceable and upon default, the vendor may terminate the contract, regain possession of the property, and retain the payments made." (citations omitted)).

New Mexico courts generally enforce real estate contracts according to their terms, unless "enforcement of the literal terms of the contract would result in a forfeiture or in unfairness which shocks the conscience of the court." *Ritter*, 1983-NMSC-033, at ¶ 5, 99 N.M. at 562, 661 P.2d at 54; *see also Martinez v. Martinez*, 1984-NMSC-028, ¶ 13, 101 N.M. 88, 91, 678 P.2d 1163, 1166 ("We recognize that real estate contracts containing notice and forfeiture provisions commonly are enforced."); *Bishop v. Beecher*, 1960-NMSC-103, ¶ 17, 67 N.M. 339, 343, 355 P.2d 277, 280 (where buyers failed to comply with the terms of the real estate contract, "absent unfairness which shocks the conscience of the court," the sellers are entitled to enforce the contract); *Shaw v. Dawson*, 48 B.R. 857, 861 (D.N.M. 1985) ("New Mexico courts have not held forfeiture provisions in real estate contracts invalid."). However, because courts should construe the parties' actions under a real estate contract "if at all possible, so as to avoid a forfeiture," *Jackson v. Hilburn (In re Jackson Bros.)*, 11 B.R. 114, 116 (Bankr. D.N.M. 1981) (citations omitted),[41] it is appropriate for the Court to hold sellers to the strict requirements of the default provisions in a real estate contract before concluding that such contract has been terminated. Further, proper notice to the buyer of seller's intent to forfeit the property is key. *Jackson Bros.*, 11 B.R. at 116 ("The law in New Mexico requires the vendor to give proper notice of his intent to forfeit the contract or it remains in effect."); *Martinez v. Martinez*, 1984-NMSC-028, at ¶ 18, 101 N.M. at 93, 678 P.2d at 1167 (finding that the buyer was given insufficient time from the notice of default under the real estate contract to cure the default

---

[41] *See also Martinez v. Martinez*, 1984-NMSC-028 at ¶ 15, ¶ 17, 101 N.M. at 92, 678 P.2d at 1167 (recognizing the New Mexico Supreme Court's "longstanding disapproval of forfeitures" and stating further that "we are not compelled in every case to enforce a real estate contract when fairness and legal principles dictate that we should not.").

-10-

Case 21-11384-j13   Doc 71   Filed 12/07/22   Entered 12/07/22 13:35:03 Page 10 of 19

before the contract was declared forfeited); *see also In re Hursey,* 292 B.R. 889, 893 (Bankr. C.D. Ill. 2003) (concluding that debtor had not properly terminated buyer's interest under real estate contract where evidence indicated that the buyer did not receive the mailings of default and was not given proper notice of the termination of her rights).

The REC required the Herrings to give Debtor and Mr. Menchaca written notice of default "by certified mail, return receipt requested, and regular first class mail."[42] The Final Notice of Default reflects that it was sent by "Certified mail" and provides a tracking number.[43] It does not specify whether it was sent "return receipt requested" and there is no way to determine from the face of the Final Notice of Default whether it was also sent by regular mail. The Herrings did not provide a copy of a signed return receipt for the Final Notice of Default as evidence that Debtor or Mr. Menchaca actually received the notice. Nor did Mr. Watson, who prepared and sent the Final Notice of Default, appear at the final hearing to testify whether he sent the letter by certified mail return receipt requested and by regular mail. Nor did Debtor appear and testify at the final hearing, so he could not be asked whether he received the Final Notice of Default. Based on the evidence admitted at the final hearing, the Court concludes that the Herrings failed to establish that they gave proper notice of default to Debtor and Mr. Menchaca in accordance with the terms of the REC. The REC plainly required default notices be sent by certified mail, return receipt requested, and the Herrings did not offer any evidence of a signed return receipt for the Final Notice of Default and did not otherwise prove actual receipt.[44]

---

[42] REC, ¶ 8(B) – Exhibit M.
[43] Exhibit R.
[44] *See Hursey,* 292 B.R. at 893 (concluding that debtor was not given proper notice of termination of her rights under the real estate contract where the uncontroverted evidence indicated that the sellers attempted service of the notice of default by certified mail, but those mailings were returned unopened and were not received by the debtor).

-11-

The Herrings also did not strictly comply with other requirements under the REC to effect a termination. For example, the Affidavit of Uncured Default did not include a legal description of the Property or the recording date of the REC as required by ¶ 8.D of the REC.[45] In addition, the Affidavit of Uncured Default is dated November 8, 2021, *before* the expiration of the 30-day cure period provided in the Final Notice of Default. Because November 7, 2021, fell on a Sunday, the 30-day cure period applicable to the Final Notice of Default sent October 8, 2021, was the close of business of MSE on the following day, November 8, 2021.[46] And while it is possible that the Herrings did not execute the Affidavit of Uncured Default until after the close of business on November 8, 2021, insufficient evidence of the circumstances and timing of the Affidavit of Uncured Default was presented at the final hearing. The Herrings' REC attorney, Matthew Watson, who sent the Affidavit of Uncured Default to MSE on November 9, 2021, did not testify at the final hearing.

In sum, while some of the technical defects in the Herrings' efforts to terminate the REC may not seem particularly material, the Herrings' failure to establish that they complied with the notice requirements for sending the Final Notice of Default to Debtor and Mr. Menchaca by certified mail, return receipt requested, and by regular mail, prevent the Court from concluding that the Herrings terminated the REC pre-petition. The evidence now before the Court is insufficient to establish that the Herrings properly terminated the REC pre-petition in accordance with its terms.

---

[45] It does not appear that the REC was recorded, so the Herrings could not comply with that requirement.
[46] The REC provides that "the period for curing the default will extend to the close of business on the next business day of Escrow Agent" if the final day to cure the default falls on a non-business day. REC, ¶ 8(C)(2) – Exhibit M. The 30th day after October 8, 2021 was Sunday, November 7, 2021, a non-business day.

B. Whether the Herrings are bound by the Debtor's confirmed Plan

Under 11 U.S.C. § 1327(a), "[t]he provisions of a confirmed plan bind the debtor and each creditor" to its terms, regardless of whether the creditor "objected to, has accepted, or has rejected the plan." This Code section promotes finality and "serves the same purpose as the general doctrine of res judicata." *In re Mersmann*, 505 F.3d 1033, 1047 (10th Cir. 2007), *abrogated on other grounds by United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010). Thus, where a creditor receives notice of a plan and fails to object, the creditor may not later object to its treatment once the plan has been confirmed. *See In re Shook*, 278 B.R. 815, 825 (9th Cir. BAP 2002) ("Due process is the linchpin to determining the rights of secured creditors in chapter 13, and if a creditor receives clear notice, but chooses to ignore the bankruptcy proceedings, it does so at its peril." (citation omitted)).

An exception to the binding effect of a confirmed plan arises where a creditor "would be denied due process for lack of notice." *In re Rodgers*, 180 B.R. 504, 505 (Bankr. E.D. Tenn. 1995) (citing *United States v. Cardinal Supply, Inc.*, 916 F.2d 1087 (6th Cir. 1990)); *see also In re Linkous*, 990 F.2d 160, 162 (4th Cir. 1993) (same); *Greer v. Healthcare Fin. Servs., LLC (In re Greer),* 498 B.R. 98, 111 (Bankr. S.D. Miss. 2013) (creditor who did not receive timely or proper notice of the contents of the plan was not bound by confirmed plan). Thus, "the need for finality does not trump a creditor's due process rights and before a plan can become binding, creditors and parties in interest must receive notice and be given an opportunity to object to confirmation of a debtor's plan." *In re McLemore*, 426 B.R. 728, 735 (Bankr. S.D. Ohio 2010) (citing *In re Harris*, 293 B.R. 438, 441 (Bankr. N.D. Ohio 2003)); *see also In re Welsh*, 540 B.R. 672, 681 (Bankr. E.D. Ark. 2015) ("A creditor who has received no notice of the contents of a plan has been deprived of due process and the terms of that plan cannot be binding on that

-13-

Case 21-11384-j13    Doc 71    Filed 12/07/22    Entered 12/07/22 13:35:03 Page 13 of 19

creditor." (citing *Erdmann v. Charter One Bank (In re Erdmann)*, 446 B.R. 861, 866 (Bankr. N.D. Ill. 2011))).

Requiring debtors to list creditors with their proper mailing address serves the purpose of affording creditors basic due process notice. *In re Glenwood Med. Grp., Ltd.*, 211 B.R. 282, 285 (Bankr. N.D. Ill. 1997) (citations omitted). Under Fed. R. Bankr. P., 2002, creditors are entitled to receive 21-days' notice by mail of the meeting of creditors, and 28 days' notice of the hearing to consider confirmation of a debtor's chapter 13 plan. *See* Fed. R. Bankr. P. 2002(a)(1) and (b). It is the debtor's burden to demonstrate that creditors received appropriate notice as required by Fed. R. Bankr. P. 2002. *Welsh*, 540 B.R. at 677.

Debtor used the Herrings' former Anthony, NM address listed in the REC to send bankruptcy notices to the Herrings. Debtor also sent bankruptcy notices to Mr. Watson, the attorney who represented the Herrings in connection with the REC and who sent the notices of default under the REC to Debtor and Mr. Menchaca. However, the uncontroverted evidence indicates that Debtor was aware that the Herrings had moved away from Anthony, New Mexico and had the Herrings' new address in Falls City, Texas before or shortly after he filed his voluntary chapter 13 petition.[47] Yet, Debtor continued to use the Anthony, NM address to send the notices of Debtor's bankruptcy case, the meeting of creditors, the confirmation hearing, and the deadline to object to confirmation to the Herrings. Despite having the Herrings' new address, Debtor never updated the Herrings' mailing address in the bankruptcy case. Mr. Herring's testimony at one point was that he learned of the bankruptcy from Mr. Watson in January of 2022, yet he also testified with greater certainty that he did not learn of Debtor's Plan until after it had already been confirmed. The Herrings' REC attorney, Mr. Watson, did not testify at the

---

[47] Debtor filed his bankruptcy case on December 23, 2021. Mrs. Herring testified that she gave Debtor and Mr. Menchaca the Herrings' new address "before Christmas."

-14-

final hearing, so no conflicting or corroborating testimony regarding the Herrings' knowledge of Debtor's bankruptcy case was presented to the Court. Mr. Herring also acknowledged that he and Mrs. Herring had their mail forwarded from the Anthony, NM address to their new address in Falls City, Texas, but also testified that he did not receive any notices from the bankruptcy court at the Texas address. Based on this inconclusive evidence, the Court cannot pinpoint whether the Herrings received notice of Debtor's bankruptcy filing or the deadline to object to the Plan or had actual knowledge of the bankruptcy case before the Plan was confirmed. And because the uncontroverted evidence indicates that Debtor had the Herrings' new address but did not include it or update it on the bankruptcy mailing list, the Court concludes that the Herrings did not have adequate notice of Debtor's bankruptcy case sufficient to bind them to the terms of the confirmed Plan.

      C.      Whether "cause" exists to grant relief from the automatic stay

The Motion includes an alternative request for relief from the automatic stay. Relief from the automatic stay may be granted based on "cause," including a lack of adequate protection of the creditor's interest in the property. 11 U.S.C. § 362(d)(1). The Herrings assert that "cause" exists to grant relief from the automatic stay based on 1) their contention that the REC was terminated pre-petition, 2) Debtor's failure to make payments under the REC since 2021, and 3) his failure to provide proof of insurance for the Property. The Herrings also assert that stay relief should be granted under 11 U.S.C. § 362(d)(2) because Debtor does not have any interest in the Property (other than a possessory interest) and the Property is not necessary to an effective reorganization.

The Herrings have not demonstrated that stay relief is appropriate.[48] As determined above, the Herrings did not establish that they properly terminated the REC. Consequently, as of the petition date, Debtor retained an equitable interest in the Property as a buyer under the REC.[49] Debtor's confirmed Plan, though not now binding on the Herrings, provides for post-petition payments under the REC plus payment of the arrears under the REC over the term of the Plan, providing the Herrings with adequate protection of the payment obligations under the REC. On the other hand, a lack of insurance can also establish that a creditor lacks adequate protection. *See In re McGrath*, 625 B.R. 774, 778 (Bankr. D.N.M. 2020) (lack of adequate protection based on a decline in the collateral value includes the failure to maintain property insurance or to keep the property in good repair (citing *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994))); *In re Young*, No. 7-11-12544 JS, 2011 WL 3799245, at *7 (Bankr. D.N.M. Aug. 29, 2011) (recognizing that a lack of insurance on the property may establish that the creditor is not adequately protected). Thus, to ensure that the Herrings' interest in the Property is adequately protected, the Court will condition the continuation of the automatic stay on Debtor providing the Herrings with proof of insurance for the Property.

    D.      Whether the REC is an executory contract or a security device

In connection with the Motion, the parties argued whether the REC constitutes an executory contract subject to 11 U.S.C. § 365 that Debtor was required to assume or reject in Part 7 of the Plan rather than treat it as a secured claim subject to modification under 11 U.S.C.

---

[48] "A creditor seeking relief from the automatic stay for 'cause' bears the initial burden of going forward to demonstrate sufficient grounds to lift the stay." *In re Thorp*, 624 B.R. 726, 740 (Bankr. D.N.M. 2020) (citing *In re DB Capital Holdings, LLC,* 454 B.R. 804, 816 (Bankr. D. Colo. 2011)).

[49] *See Bank of Santa Fe v. Garcia*, 1985-NMCA-026, ¶ 7, 102 N.M. 588, 590, 698 P.2d 458, 460 (a purchaser under a real estate contract holds equitable title to the property); 11 U.S.C. § 362(g)(1) ("[T]he party requesting such relief [from the automatic stay under § 362(d)] has the burden of proof on the issue of the debtor's equity in the property.").

§ 1322 as Debtor in fact provided in Part 4 of his confirmed Plan. In *Shaw v. Dawson*, 48 B.R. 857 (D.N.M. 1985), the United States District Court for the District of New Mexico held that a New Mexico real estate contract is an executory contract subject to 11 U.S.C. § 365.[50] *Shaw v. Dawson* is not binding precedent. *See In re McGrath*, 621 B.R. 260, 263 (Bankr. D.N.M. 2020) ("[B]ankruptcy courts are not bound by district court decisions.").[51] Nevertheless, the New Mexico bankruptcy court in the past has treated real estate contracts as executory contracts. *See, e.g., In re Munoz*, 610 B.R. 907, 911 (Bankr. D.N.M. 2019) (observing that "[t]he rule in this district is that real estate contracts are 'executory contracts' subject to § 365" but noting that there is a national split in the case law on this issue and applying *Shaw* where the parties did not challenge *Shaw*); *see also In re Bellamah Community Development*, 107 B.R. 337, 341 (Bankr. D.N.M. 1989) (relying on *Shaw* to conclude that the Arizona real estate contract at issue was an executory contract).

Whether the real estate contract is treated as an executory contract or as a security device can have significant consequences for a debtor.[52] If a real estate contract constitutes an executory

---

[50] The *Shaw* Court recognized that courts in other jurisdictions construe real estate contracts as security devices, but concluded that the nature of a real estate contract under New Mexico law "appears to fall squarely within the Countryman definition of an executory contract" such that a real estate contract is an executory contract "within the definition contemplated by Congress [for bankruptcy purposes]." *Shaw v. Dawson*, 48 B.R. at 860. The *Shaw* Court concluded that a real estate contract is an executory contract regardless of the fact that the deed to be delivered to the purchaser upon full payment is placed in the hands of an escrow agent. *Id.* at 861.

[51] *See also Camreta v. Greene*, 563 U.S. 692, 709 n. 7 (2020) ("A decision of a federal district court judge is not binding precedent either in a different judicial district, the same judicial district, or even upon the same judge in a different case." (quoting 18 J. Moore et al., *Moore's Federal Practice*, § 134.02[1][d], p. 134-26 (3d ed. 2011))); *Daly v. Deptula (In re Carrozella & Richardson)*, 255 B.R. 267, 272 (Bankr. D. Conn. 2000) ("[A] judge of the bankruptcy court . . . is not bound by the decision of single district court judge.").

[52] As explained by the bankruptcy court in *Bellamah*,
> If the installment land contract is an executory contract and is assumed, any default must be cured, damages paid and adequate assurance of future performance given. 11 U.S.C. § 365(b)(1). No modification of the terms is allowed without agreement of the contracting parties. *In re McDaniel*, 89 B.R. 861, 863 (Bankr. E.D. Wash. 1988). On the other hand, if the installment land contract is a security device or mortgage, the default does not need to

contract, then a debtor who wishes to retain the property must assume the contract in accordance with 11 U.S.C. § 365 and "promptly cure" any arrearages. 11 U.S.C. § 365(b)(1)(A). If a real estate contract is a security device, a chapter 13 debtor may cure arrears over the life of the plan. 11 U.S.C. § 1322(b)(2), (3), (5), and (c). The Court need not decide at this time whether the REC is an executory contract because, regardless of whether the REC constitutes an executory contract or gives rise to a secured claim, the Herrings are not currently bound by the terms of the confirmed Plan.

## CONCLUSION

The Motion requests the Court to determine that the automatic stay does not apply because the REC was terminated pre-petition, or, in the alternative, grant relief from the automatic stay. The Herrings have failed to establish that the REC was properly terminated pre-petition. However, to ensure that the Herrings' interest in the Property is adequately protected, the Court will require Debtor to provide the Herrings with proof that the Property is insured. The Herrings have otherwise not demonstrated that cause exists to grant relief from the automatic stay. By separate order consistent with this Memorandum Opinion, the Court will deny the Motion, conditioned upon Debtor providing the Herrings with proof of insurance for the Property, and grant Debtor an opportunity to file a post-confirmation modification to his Plan to provide for treatment of the Herrings' claim, with an opportunity for the Herrings to object.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

---

be cured and payment may be modified. . . . Thus, it is more beneficial for the debtor who wishes to retain property, if the contract is treated as a lien or mortgage, rather than as an executory contract. *McDaniel*, 89 B.R. at 863-64; *In re Booth*, 19 B.R. 53 (Bankr. D. Utah 1982).

*Bellamah*, 107 B.R. at 339.

Date entered on docket: December 7, 2022

COPY TO:

R. Trey Arvizu, III
Attorney for Nelson Gonzales
715 E. Idaho Ave., Suite 3f
Las Cruces, NM 88001

Christopher M. Gatton
Giddens & Gatton Law, P.C.
Attorney for Frances and Grover Herring
10400 Academy NE, Suite 350
Albuquerque, NM 87111